Looks like we're ready to hear 19-8013 Cooper v. Reichert. Mr. Vickery? Yes, Your Honor. I'm Lanny Vickery here on behalf of the appellants. I'd like to reserve three minutes for rebuttal, if I might. May it please the Court. The catastrophic brain injuries suffered by 26-year-old Jason Cooper were entirely foreseeable, and they were entirely predictable. In fact, this is the sort of thing that happens when a tire technician is changing a tire in the trajectory of a possible explosion. Now, because of that, because explosions happen every day, because they are not preventable, you can still prevent the catastrophic injuries that might result from them. And that is why OSHA, TIA, and the boss's own training materials emphasize this danger to such a huge degree. Why do you have to have a tire cage? To put the tire in it so that if the tire explodes, projectiles don't hit the tire tech. Why do you have to have a remote inflation device? To get the tire tech out of the trajectory of a potential explosion. Why do you have to overinflate by 20% before you go back in to do the final check on the tire? Because basically you're inducing a tire that if it's going to explode, it's going to explode by the overinflation, so when you bring it back down, it should be a lot safer for the tire tech to go back into the trajectory. All of these directly impact the recognition that the greatest danger faced by these tire techs on a daily basis is the danger of a tire explosion, and indeed that's the subject of a stipulation between the parties. These parties stipulate that the prior danger to tire technicians occur during reinflation of the new tire after it has been mounted on the rim. Now, Frank Reichert knew this. He knew this because it had been drilled into him by his training at BOSS. He knew very well that there had been not one or two, not five or ten, but hundreds of thousands of prior truck tire explosions because that was the focus of his training. That's what they trained him on. He knew how it could happen. He knew what might happen if it did happen. He knew that there were only two tools available to protect. Did Mr. Cooper have a similar knowledge? There is some indication, of course, that Mr. Cooper was also trained, and if we go back and get to that point, I think the finder of fact would evaluate whether or not Mr. Cooper appreciated the dangers and whether that constituted contributory negligence. But I think that is for the finder of fact to determine if we get back to that point. There's no dispute that he would have a general awareness of the danger of changing these types of tires. That Mr. Reichert would? Cooper. Mr. Cooper, I would think, would have some general awareness of the danger as well. What was the training provided by BOSS to Mr. Cooper? Well, Mr. Cooper was trained on some of the same materials that Mr. Reichert would. It's unclear as to the scope of his training. As I've pointed out in a few places in our brief, there are things that they say he was trained on that apparently he was not. So there's some dispute about that. But there is no dispute that Mr. Cooper received some training in changing tires and of the dangers. And who was responsible for that training? For Mr. Cooper's training? Mr. Cooper's training would have been BOSS in conjunction with Mr. Cooper. I'm sorry. Did Mr. Reichert have responsibility for training Mr. Cooper? Oh, of course. Mr. Reichert said, look, I mean, Mr. Reichert was the supervisor, the manager of the BOSS at this shop. He was the one who was in charge of safety. And he said, sure, there's always going to be on-the-job training. Did Mr. Cooper have the ability to take this tire elsewhere where you had the longer tools and where you had a more safe location to do this work? As we said, in hindsight, yes, sir. It would have been a good idea for him to take it back to the shop. Back to the shop. So did anybody tell him, sorry, we're behind, we don't have time for that, just get moving? I don't care if you're concerned. Your Honor, there's no evidence of that one way or the other. Just reviewing the Wyoming cases on culpable negligence and willful and wanton conduct of co-employees, I don't see any that are like that. Are you asking us to extend that law beyond what the Wyoming Supreme Court has? Absolutely not, Your Honor. What case covers that situation? Well, the cases that are close, the Herrera case is close, the Hannafin case is very, very intrusive. Let's don't go too fast. The Herrera case, they're cleaning the pipe and the so-called pig that they clear the pipe with gets stuck and now being ordered to kink the pipe and expressing concerns about doing that and told you shall do that. That's nothing like this case, is it? Well, it's very much like this, Your Honor. In that case, the written policy of the employer said don't do it this way, and the court actually had to infer that the co-worker had been given a copy of it and that he knew about the dangers of it. In this case, we have a nuclear difference in the amount of training, the amount of knowledge that Mr. Riker had. Now, in terms of you shall do it, which I think is the threat to fire the direct order to do the work, where you don't find that is in the Hannafin case. The co-defendants in Hannafin were higher-level employees. There was the safety manager and the mine manager, and not only is there no evidence in that case of you've got to go do this or we're going to fire you, there's no real evidence that I can see that there were even any conversations. In that case, you do have evidence of other employees and people notifying the supervisor, this is a dangerous situation and you need to do something about it. There is plenty of evidence in Hannafin that this is an extremely dangerous situation. The evidence in this case of the danger of being in the trajectory of a tire explosion and the need to get your techs out of that is every bit as dangerous. But Mr. Riker testified he had never seen Mr. Cooper change a tire in an unsafe manner. So do we have the kind of evidence that would put Mr. Riker on notice here? Absolutely, Your Honor. Mr. Riker testified directly in response to a question, you knew that because the remote inflator didn't work that Jason and Josh were changing tires in the trajectory, and he said yes. He also testified he thought there was another longer inflation device on the truck. Don't believe so, Your Honor. I think there's a dispute in the evidence about whether it was, but Mr. Riker testified there was another one. Mr. Riker, well, I don't recall that testimony if it's in there. What Mr. Riker testified to is that the remote inflator on the service truck did not work and they weren't using it and he knew it and they were square in the trajectory of the tire of an explosion when they were changing the tire. And he knew that was happening and yet he testified in other places, if I knew that there was something wrong with the equipment, you know, we'd replace the equipment. His supervisor up the chain, Mr. Doty, said, look, he didn't have to go through corporate for this. If you've got a remote inflator that's not working, he's got the authority to do that himself. He's the supervisor. He's the boss. He's in charge. And so, of course, he should have done it, but he chose not to do it. And I think instructive on that is his comment, and I've never seen this in 35 years of law practice, where he volunteered that they're cutting corners on the overinflation requirement. That wasn't someone else putting words in his mouth. He said, well, we cut that corner. Well, if you're cutting corners. Does the failure to overinflate in this case matter? Does it matter? It matters greatly, Your Honor. The ultimate inquiry in this case is, is there evidence of the proper intent for willful and wanton conduct, as the Bertonelli case defined it. But the explosion here wasn't caused by the failure to overinflate. It was a faulty tire that exploded before or at the normal inflation pressure, right? What you just said seems to be true. I believe that to be true. But the reason that it's important is because what we're trying to evaluate here is the supervisor's intent with respect to safety for his tire tax. Does he have to understand? First of all, OSHA doesn't have the overinflation rule, do they? That's the TIA rule, correct. Right. And so at least OSHA doesn't think it's that important. Mr. Reichert testified that he didn't understand why you would have to do it up to 120 and then go back to 100. He says, well, if it's, you know, I mean, under the Wyoming test, doesn't he have to understand the risk and then almost up to wanting to cause harm move forward anyway? Almost being the key word. There's a couple of things in there, so let me unpack it. To say that, I mean, there's no question that he chose to cut the corners. And going back to Judge Tinkovich, I don't know if I finished the answer to your question. The reason that is relevant is because what we're talking about is intent. And Wyoming allows proof of intent by looking at all the circumstances. And so what this man is saying is we cut corners with respect to safety. And if you're cutting a corner, that means you know where the corner is. So, Judge McHugh, getting back to your question, there's certainly a fact question as to what his intent was. That can't be determined as a matter of law unless we make a credibility determination that he really did think it was an extravagance. That's exactly what the district court did. But this case is here on summary judgment, and the inference has fallen in our favor on summary judgment. But do you have any evidence that he did the contrary? I mean, you know, he's testified, I didn't understand what the purpose of going to 120 was. And so I didn't make people go past 100 on this. Don't you have to come up with contrary evidence, not just speculation that he's lying? Well, that's not quite what he said. What he said that he was specifically trained in, again, the OSHA versus TIA, his training by boss was based on both OSHA and TIA, and he was unquestionably trained, and he admitted it, that he was trained to take it up to 120, but he just didn't do that. He chose not to do that. That's intent, and that's the fact. Well, he said if the tire is going to fail, it's going to fail at 100 PSI. To me, it's kind of an extravagance. It's really, I don't think it's necessary. That's his testimony. That is his testimony, and if a finder of fact believes it to be credible, they can make a factual determination. But on summary judgment, we get the inferences in our favor on that. We know he was trained. We know he knew about it. We knew he understood that he was supposed to do it, and we know he voluntarily cut that corner. So he knew where the corner was. He knew what he was supposed to be doing, but he chose to do something entirely different. And let me go back, Judge McHugh, I don't think I ever really got to your question about approaches to the intent to do harm. I know I'm starting to run to my rebuttal time, but one thing I do want to say about that is that the courts have really come off of that. In both Bertinelli and in Hanifin, they've said that the plaintiff is required to produce evidence, the co-employee acted with a state of mind approaching intent to do harm or committed an act of an unreasonable character in disregard of known or obvious risks, so great as to make it highly probable that harm would follow. Unquestionably, this man was trained on the risk, this is the danger, and whether or not he intentionally, I mean we know he intentionally acted, there's evidence of that, whether or not that is true for the basis of a judgment is to be determined as a question of fact by a jury. I'd like to reserve the rest of my time if I could. You may. Thank you. Thank you. May it please the court, Christopher Reeves for the appellee, Mr. Reichert. Your Honors, as some of you have noted in prior opinions as to Wyoming's punitive damages law in evaluating willful and wanton conduct, Wyoming has a significantly high bar in demonstrating willful and wanton conduct. The district court was proper in determining that the evidence in the record does not reflect evidence which is sufficient for a jury to find willful and wanton conduct, such to strip a co-employee of their immunity under the workers' compensation statute. Under pattern instruction 8.16 in Wyoming, there's three criteria, and the district court actually walked through those. As also stated in the Bertonelli case, you have to have knowledge of the hazard or the serious risk involved, responsibility as the employee who has injured their safety and their work conditions, and then finally the willful disregard for the need to act despite awareness of a high probability that serious injury or death will result. Justice McHugh, you opined in an opinion, the Cunningham v. Jackson whole opinion in 2016, that it has to approach the intent to harm. The case you cited was Kramer v. Power, River, Cole, a Wyoming case from 2019. Kramer goes on to say that, as stated another way, the facts must have some element of outrage similar to that found in a crime. What evidence of outrage or what act of outrage is in this case? He was his supervisor. He had the least experience. The record is clear. He had the least experience as a tire technician of the entire shop. He was hired to maintain the shop because of his military background. Mr. Cooper had significant experience. He came from another shop as a tire technician, Lucky's Tires, down the street. He had been trained by them. Those records are in the record as well. And then he was trained by Boss as well. He went through the same training, not any larger or smaller than Mr. Reichert went through. Taking the, oh, sorry. I just wondered, did Mr. Reichert know that the remote inflation device on the truck was faulty or not working? In his deposition testimony, he did testify that he was aware that the employees stated that sometimes they leak and therefore they come off the valve or otherwise won't stay on the tire. The evidence, which you were asking about, is where the remote inflators on the truck. There were two remote inflators on the truck. They've questioned that only because in initial photographs of the truck immediately after the accident, they didn't appear in there, but then later in the discovery process, we got the photos from OSHA that showed the remote inflators actually in the truck and that the truck had been sealed. The testimony is the truck had been sealed since the time it was seized from OSHA. There is no evidence there was not a remote inflator or particularly two in the truck at the time of this incident. He had the alternative, should he want to, to go to the shop, which was 100 feet away. This driver came in. His tires were on tire, crispy as Mr. Cooper described them. He had knowledge that the tires had been exposed to fire. He had knowledge that there was probably a likelihood of heat damage. Nonetheless, Mr. Cooper chose to reuse the rim and apply a new tire to it. Nobody at BOSS, Mr. Reichert did not know that Mr. Cooper would make the decision to apply a new tire to a heat-damaged rim. The argument on the other side is that that's getting into a jury question about contributory negligence or assumption of the risk, right? So here we're looking at the three-part test that you've identified, and with regard to knowledge of the hazard or serious nature of the risk involved, you concede that Mr. Reichert was aware of that, right? Yes, and that's where they're muddling the task versus something that's exacerbating the safety at hand in the task. In the mining cases, in the oil rig cases, all these different cases Wyoming has as relates to Willful and Wonson, it's inherent in mining or dynamiting or lifting pipes that there are significant safety issues. But as long as they're done safely and properly and according to policy, then it is accepted that they are being done within a reasonable, safe manner. In this case, unbeknownst to Mr. Reichert, plaintiff exacerbated his safety risk by applying a tire to a heat-damaged rim. OSHA found that because he decided to use the heat-damaged rim, that's why the tire came off. So he exacerbated that exposure. Otherwise, every ultra-hazardous activity Wyoming has that law would be per se Willful-Wonson if there's an injury under that analysis. Well, did Mr. Reichert know that Mr. Cooper was entering the trajectory and using short tools to change truck tires? Actually, in his testimony, what he says is that he had only understood that they were using it for dually tires, not for single tires, and that he did not understand they were getting into the trajectory zone. Rather, the question was, well, you would expect that if they're that close, at some point they may have to get into the trajectory zone. He says, well, I would assume so if they're checking the air pressure. Even OSHA in its own materials recognizes at some point you have to get into trajectory zone. It's just whether or not the tire is stabilized sufficiently that it's a safer alternative than otherwise. So he did know that they were using the short tools, as they're called. He, in his deposition testimony, made it very clear. He believed it was only when they were using on duallys, not on a single, which is the case in this situation. No employee ever came to him and said, we feel unsafe. In fact, his testimony about the short tool issue is that we decided, kind of like the over-pressurization, he said, we decided that that just wasn't what we needed to do, or we didn't have to otherwise change the way we were doing the practice. It was a group effort. That goes to comparative fault, but it also goes to his mens rea, his mindset. Here he is, he just got trained. He's almost a year into the job. He's working with two very experienced employees who had been working for three or four years as tire technicians. They felt comfortable to use a short tool, and yet now Mr. Riker is being faulted for allowing them to use a short tool. At no point did Mr. Feltzer or Mr. Cooper ever express any concern whatsoever. That's where you fall into the cases, as outlined in my brief, where there's clear cases that Wyoming says is willful and wanted. Usually it's someone sees a hazard, they say, I don't feel safe. Can we stop? The boss says, you're going to move forward anyway, or you're losing your job. That's something that even a jury gets excited about and says, wait, that's criminal, that's wrong, nobody should be put in that position. The other situation is similar instances, where they're constantly having injuries, or maybe it's just injuries remote in time. And you have the, I think it's the Halifan case, where six months before there had been a concern, and then the day before an employee expressed a concern about, I don't feel safe. And in that one, the mine was known as the coffin, that everybody perceived as such a hazard and such a danger that they gave it a very ominous nickname. Nobody's given this tire a nickname. Tires get changed all over the world. It has its dangers just as many types of technical jobs, whether it's oil wells or anything else. That doesn't mean simply because it's a dangerous job that all of a sudden it's willful and wanted and if an accident happens. And that's what they argue. In the reply brief, they say, Wyoming should adopt some type of scaled approach and analysis depending on the size of the operations, and say, well, because it's a smaller operation, it brings forth a larger emotional charge that this accident happened versus if it was a bigger corporation. There's nothing in Wyoming law that permits that. The record is void of any near misses. Mr. Reichert was never aware of any similar instances. There was some argument about, well, there's hundreds of thousands. He was not trained on hundreds of thousands. He was trained that there is a risk if you don't do your job safely. That's what he was trained on. There is no evidence in the record that BOSS, either as a corporation or as the shop ever had any near misses or actually accidents relating to using short tools or even tire changes. The record is void that any of the employees stated the complaints. The record is void of any instruction that Mr. Reichert gave to Mr. Cooper that you're going to do your job and you're going to do it or you'll get fired. In fact, in this instance, Mr. Cooper was out on his own. He was working the night shift. He got called out. The only person he talked to was the BOSS operator. And you have the transcripts where he's describing, oh, man, this driver's crazy and he's running on the rim and the tire's on fire, and there's all this exchange between him and the BOSS operator. At no point does Mr. Reichert get on the line and say, you're going to change that tire and you're going to change it 100 feet away from the shop versus in maybe a safer location in the shop. And you're going to use the short tools or you're going to use a remote inflator and then let it fail on you, and then, you know, there's none of that dialogue. And what you see in the Wyoming case law is this sense of ultimate imminency, that something's going to happen. It may not happen this moment, but it's going to happen this week or this month. There's no imminency in this case. Nobody says, oh, this is going to happen and we need to fix this or else someone's going to get injured. It's probably imminent with that sort of a rim, though, don't you think? What's that? The explosion if you put it on a burnt rim. And that's what caused this explosion, right? Yes. I mean, the evidence is, I mean, OSHA found that that was what caused the accident. I mean, there's, you know, correlated causes that we're arguing about in this case. But the cause is that he made a poor decision and reused a fire-damaged rim that was warped. A simple roll test or otherwise that he had been trained on would have demonstrated that the rim was warped and the tire was likely to, the bead was going to fail and pop off. He made that decision without any consultation of Mr. Riker or the boss or anyone else. There is evidence there was some pressure from the driver to make the repair as cheap as possible. That's in the transcript between Mr. Cooper and the operator for boss, that the driver wanted as cheap an alternative as possible. But he used a cage. He was following his training. But for whatever reason, he decided to reuse that rim. And that's what ultimately caused this. So, you know, in closing, I would just say that Wyoming law is clear. Two of you have evaluated Willful and Wanton and maybe possibly a third under Wyoming law. It's a very high burden. And I think the district court was correct in finding that this may show negligence. It may even show gross negligence. But there's no mens rea. There's nothing there that Riker did anything other than maybe just not pay attention and contemplate what the risks were. But Wyoming law requires actual knowledge of the safety concern or the danger posed to the employee. And in this case, he did not have that knowledge. So I appreciate your time today. Thank you, counsel. We have some rebuttal time left. Thank you, Your Honor. I did not mean to use my computer, but I want to make sure that I have Mr. Riker's testimony exactly right. This is not with regard to Dualies or anything else. He was asked the question, you knew that by using these short tools because the remote inflation device wasn't working properly, these men were in a zone of danger when they were inflating the tires, right? His answer, yes. That is directly analogous to the situation in Hanifin. In Hanifin, a rock fell off the top of the mine onto equipment that the plaintiff was operating. And if that equipment had had falling object protection, he wouldn't have been hurt. Exactly like that in this case. Mr. Riker says, yeah, if we'd had a working remote inflator so that he wasn't in the trajectory, he wouldn't have been hurt. So you have a critical piece of equipment that could have avoided the problem in both cases, and it wasn't used. Real quickly, Judge Phillips, I want to go back to one of your questions about taking it into the shop. Mr. Riker was asked directly about taking it into the shop, and he said he had no criticisms. They were supposed to use the service truck, and they did. In my last 30 seconds, since the law for co-employee liability was completely restated by Bertinelli in 2003, there have been seven cases from the Wyoming Supreme Court on co-employee liability. Three have found that there was a fact question. Four have found that there were not. I think if you look at those seven cases, what you see, the common theme is the magnitude of the danger and whether or not a reasonable person in this situation should have understood the magnitude and should have taken some action in response to the magnitude of the danger. In this case, the danger faced by these men was the danger of a tire explosion, and if that happens, they die or they get catastrophic injuries exactly like happened to Jason Cooper. Thank you, Your Honor. Thank you, counsel. You are excused. The case shall be submitted. The court will be in recess until tomorrow morning.